636 So.2d 1053 (1994)
Eddie L. FINKELSTEIN
v.
Wayne A. COLLIER.
No. 93-CA-999.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1994.
*1055 Allen H. Borne, Jr., New Orleans, for plaintiff/appellee.
Edward D. Markle, New Orleans, for defendant/appellant.
Before KLIEBERT, BOWES and WICKER, JJ.
WICKER, Judge.
This is a suit for legal malpractice, in which the plaintiff alleged that the defendant attorney let his tort claim prescribe. The attorney appeals from judgment in favor of the plaintiff. We affirm, for the reasons that follow.
Eddie Finkelstein, plaintiff, was hit by a car on September 19, 1987 while he was on a bicycle. Finkelstein consulted attorney Wayne Collier in January 1988 about handling his claim. In December 1988 Collier realized that the claim had prescribed and notified Finkelstein. This lawsuit ensued, in which Finkelstein sought to recover from Collier the damages he alleged he would have been awarded had the tort suit been timely filed.
The trial court ruled in favor of Finkelstein, finding that Collier was 100% at fault in the malpractice. The court found Finkelstein would have been successful on the tort claim and awarded Finkelstein $3,000 in general damages and $656 for medical expenses, plus an additional $125 for his bicycle (which was destroyed in the accident). However, the court found Finkelstein 40% at fault in the tort claim and reduced the award to $2,305.78, plus legal interest and costs.
On appeal Collier concedes that, if there was an attorney-client relationship and he merely permitted the prescriptive period to expire, then there would be liability in malpractice. Collier contends, however, that the trial court erred (1) in finding that an attorney-client relationship was formed that imposed a duty upon Collier to file suit on Finkelstein's behalf and (2) in refusing to permit introduction of documents that would have established that Collier fulfilled his duty to Finkelstein. In the event we uphold the malpractice ruling, Collier does not contest the award for the tort claim.
At trial Finkelstein testified that shortly after the accident he consulted an attorney, Sam Buckley, whom he believed had declined to handle the tort claim. Subsequently Finkelstein sought counsel from defendant, Wayne Collier, who told him "he was going to see about going through with the case." Finkelstein testified that he had signed a document in Collier's office, but stated that he did not receive a copy of the document and did not recall its contents. He said he returned to Collier's office on one occasion thereafter, to deliver photographs of the accident scene. Finkelstein also testified that he has only an eighth-grade education and that he had to attend special education classes for slow learners.
Finkelstein admitted that both Buckley and Collier had told him he would have to file suit in forma pauperis, but he did not recall being told he would have to provide affidavits to proceed in forma pauperis. Finkelstein did not recall receiving any letters from Collier.
Collier testified that Finkelstein was brought to his office in the first quarter of 1988 by Pat Newman, a former client of Collier's. Newman informed Collier that Finkelstein had previously been interviewed by another attorney, Sam Buckley. Collier telephoned Buckley, who told him he felt he had no further obligation to Finkelstein and expressed no objection to Collier's representing him. Collier then interviewed Finkelstein and explained he would represent him only if he proceeded in forma pauperis.
Collier stated he did not have Finkelstein sign a contract or a forma pauperis motion at the initial interview because Finkelstein needed to collect financial information for the pauper documents. Subsequently Collier sent Finkelstein a packet of documents to be executed which included application forms to proceed in forma pauperis. Collier testified he also prepared a petition, interrogatories and discovery requests, which were to be filed after Finkelstein completed the pauper application.
Collier did not specifically recall what transpired on the second occasion Finkelstein visited his office, except that Finkelstein delivered *1056 photographs of the accident scene. Collier testified that Finkelstein never executed a contract, but admitted that he considered Finkelstein his client, "pending his execution of all of the documents, including the contract." Finkelstein never executed or returned the documents to Collier.
Around Thanksgiving of 1988, Finkelstein telephoned Collier about his claim. Collier did not have the file before him, but told Finkelstein, "I don't recall how your case is going, but I'll review it for you and take a look at it. I don't think there is anything wrong." Subsequently he reviewed the file and realized that the prescription date had passed. On December 27, 1988, he wrote a letter to Finkelstein to notify him of the problem.
Collier stated that his only direct contacts with Finkelstein were the two office visits and the telephone call from Finkelstein in late 1988. Collier testified he had attempted to contact Finkelstein by telephone several times without success, and that Pat Newman had telephoned him on Finkelstein's behalf to inquire about the case.
Collier said he sent several letters to Finkelstein advising him he could not proceed with the suit unless he completed the necessary documents. In addition, Collier stated that about 30 days before prescription was to run he sent a letter to Finkelstein alerting him that the prescription deadline was nearing and that he needed to complete the documents, but Finkelstein did not respond. After Collier discovered the case had prescribed and notified Finkelstein of that fact, he sent his entire file to Finkelstein.
The only document regarding the attorney-client relationship that the trial judge permitted into evidence was the letter of December 27, 1988 in which Collier advised Finkelstein that his claim had prescribed. The judge refused to admit into evidence other documents that were copies of correspondence from Collier to Finkelstein prior to the prescription date, although the judge allowed Collier to proffer them. The basis for the court's refusal to admit the documents was that Collier no longer had either the originals of the documents or his file copies. (The originals of the letters had been mailed to Finkelstein and Collier had turned over his entire file to Finkelstein after he advised Finkelstein that his claim had prescribed.) Collier attempted to introduce copies printed from his computer files, but the court rejected them on objection by Finkelstein's counsel.
The documents which Collier proffered are the following: (1) a form Letter of Engagement; (2) a letter to Finkelstein dated February 1, 1988, in which Collier stated he was enclosing an original and one copy of the letter of engagement to be signed and returned, and reminded Finkelstein that he needed photographs of the intersection at which the accident occurred, as well as certain other information, all of which he asked Finkelstein to return at his earliest opportunity; (3) a letter to Finkelstein dated March 28, 1988, stating that Collier was enclosing two copies of an Affidavit of Financial Condition, to be filled out, signed and returned to Collier as soon as possible so he could file the petition in court; (4) a letter to Finkelstein dated May 5, 1988, enclosing more copies of the Affidavit of Financial Condition, advising him that they must be completed and returned to Collier as soon as possible so they could proceed to file the petition; (5) a letter to Finkelstein dated September 9, 1988, stating, in pertinent part: "We urgently need your Affidavit of Financial Condition signed and notarized. We will not proceed except in forma pauperis as we prepared in March, 1988. If these papers are not received and you take no action to file suit before September 19, 1987 [sic] you[r] right to sue will expire."; (6) copies of a petition for damages, interrogatories, request for production and request for admissions directed against the alleged tortfeasor, Peggy Wineski Flores, and her insurer, but never filed.
In oral reasons for judgment the trial judge stated,
"P-2 [the letter of December 27, 1988 in which defendant notified plaintiff that the claim had prescribed] ... states that you were engaged, at least it's an acknowledgement of it. The paragraph states that `although I believe my office and I acted fully and in accord with our engagement agreement ...,' therefore I've got to conclude *1057 that a contract was entered into for the representation of ... Mr. Finkelstein by Mr. Collier.
"The Court views the action certainly as delictual. And being delictual, I have to find negligence. And the negligence I find is in neglect on your behalf, Mr. Collier, in not notifying Mr. Finkelstein of the claim prescribing or that he has to file within the one-year period of time.
"I do have your self-serving testimony. I have difficulty when weincluding myself having practiced law 18 years of morewe're in a much higher fiduciary relationship between ourselves as a practitioner and our client. I always made it a practice of flagging prescription. * * * I have had nothing produced to me today showing that Mr. Finkelstein received the correspondence which you spoke of regarding the 30-day notice. And I certainly would want to hold on to that, in light of the fact that the claim is prescribed, even when you turn[ed] the matter over to Mr. Borne, because it was already prescribed. It seemed to me that that should have been taken out of the file, if in fact that was done. So I have difficulty in accepting the fact that Mr. Finkelstein was noticed to file his suit 30 days prior to the matter prescribing.
"With regard to the forma pauperis, to me, I just think that may come as an excuse, but that's not the real part. I think that either Mr. Finkelstein should have been gotten into the office. If you don't turn it over to him, it should be put in writing to him. This is the only thing I see in writing regarding the forma pauperis.
"I believe that Mr. Finkelstein did comply with your request probably. You said you needed photographs, which took place at your first meeting. He came back a second time. And certainly, I think, you could have had something in writing that if you want me to proceed in this matter or engage me as your counsel, these are the things I need in order to protect yourself. So, I have difficulty in concluding that, one, that you were not engaged; which you say you are engaged, that that forms a contract. Secondly, that once the contract is formed, I look at it as being delictual in not filing timely. Not filing is in neglect or not withdrawing from the file is in neglect. Not getting things in writing signed by the plaintiff is neglect, things of this nature."
On appeal Collier contends that the employment relationship was conditioned on Finkelstein's signing the written letter of engagement and executing the application to proceed in forma pauperis. Collier argues that in the absence of those acts there was no contract, because he clearly communicated the terms under which he would accept the engagement and the terms were not met.
Alternatively, if this Court agrees with the trial court's conclusion that there was such an employment relationship, Collier asserts his efforts were sufficient to fulfill his duty as an attorney and to absolve him of fault for failing to file suit, because his testimony and the proffered evidence establish that he did attempt to contact Finkelstein in advance of prescription and that he was waiting for Finkelstein to return the pauper application.
First, we conclude that the trial court erred in refusing to admit the computer-generated copies of Collier's letters to Finkelstein. To prove the content of a writing, the original writing is required, except as otherwise provided in the Code of Evidence or in other legislation. La.Code Evid. art. 1002. A duplicate is admissible to the same extent as the original unless one or more of the following conditions exists: a genuine question is raised as to the authenticity of the original; it would be unfair to admit the duplicate in lieu of the original; or the original is a contract on which the claim or defense is based, or is otherwise closely related to a controlling issue. La.Code Evid. art. 1003. The original is not required and other evidence of the contents of a writing is admissible under any of the following circumstances: the original was lost or destroyed; the original is not obtainable by any available judicial process or procedure; the original is in possession of the opponent and he fails to produce the original at the hearing after he has been placed on notice that the contents would be a subject of proof; the writing is not closely related to a controlling issue; or *1058 the original cannot as a practical matter be produced in court. La.Code Evid. art. 1004.
Since the originals of these letters were mailed to Finkelstein, obviously Collier no longer has those originals. Since Finkelstein did not recall receiving the letters, the originals must be considered to have been unavailable. Accordingly, Collier should have been allowed to introduce duplicates. Whether those duplicates were from his original file (which Collier had turned over in toto to Finkelstein) or from his computer disk is irrelevant under the facts here: since the file was in Finkelstein's possession, if the file copies differed in substance from the computer-generated copies, Finkelstein could have introduced the file copies to impeach Collier.
The three elements of a legal malpractice claim are the existence of an attorney-client relationship, negligent representation by the attorney, and loss to the client caused by that negligence. Barnett v. Sethi, 608 So.2d 1011, 1014 (La.App. 4th Cir.1992). The existence of an attorney-client relationship turns largely on the client's subjective belief that it exists. Louisiana State Bar Ass'n v. Bosworth, 481 So.2d 567, 571 (La. 1986).
We find no manifest error in the trial court's conclusion that an attorney-client relationship existed here, although there was no signed employment agreement. The testimony and documentary evidence convince us not only that Finkelstein regarded Collier as his attorney, but also Collier considered himself to be representing Finkelstein.
An attorney is negligent if he accepts employment and fails to assert timely a viable claim or causes a loss of opportunity to assert a claim for recovery: "[O]nce the client has proved that his former attorney accepted employment and failed to assert the claim timely, then the client has established a prima facie case that the attorney's negligence caused him some loss, since it is unlikely the attorney would have agreed to handle a claim completely devoid of merit." Jenkins v. St. Paul Fire & Marine Ins. Co., 422 So.2d 1109, 1110 (La.1982).
"A lawyer should not neglect any legal matter entrusted to him. La. State Bar Ass'n v. Causey, 393 So.2d 88, 91 (La.1980). An attorney owes his client the duty of diligent investigation and research. Dixon v. Perlman, 528 So.2d 637, 642 (La.App. 2nd Cir.1988).
"A lawyer who agrees to represent a client in a possible tort claim undertakes a contractual obligation in favor of the client. Under less otherwise specified between them, the lawyer impliedly agrees (1) to investigate the claim to decide whether suit should be filed, and if so, (2) to determine against whom suit should be filed and (3) to file the suit against the persons determined to be proper defendants.... At the very least, the lawyer agrees to communicate with his client about the progress of the case and steps which he intends to take in the course of the litigation."
Wascom v. State Farm Ins. Co., 517 So.2d 228, 231 (La.App. 1st Cir.1987).
In an attorney-client relationship, a client is entitled to rely on the expertise and diligence of his attorney, particularly where it is demonstrated that the client had little experience or knowledge regarding the matter which the attorney was engaged to handle. Meyers v. Imperial Casualty Indem. Co., 451 So.2d 649, 655 (La.App. 3rd Cir.1984). An omission or oversight by a client will not constitute legal fault where that omission is a result of the client's legitimate reliance on his attorney. Id. The duty of an attorney extends to the protection of his client against that client's own substandard conduct. Id.
The attorney-client contract is not usually an arm's length transaction, because the parties seldom enter the bargaining process as equals: the former comes as a member of a highly privileged profession, while the latter generally has no specialized legal knowledge or legal education. See Causey, supra. The extent of the attorney's duty to the client may depend in part on the client's particular circumstances and situation. Dixon, supra.
*1059 Although the exclusion of Collier's proffered documents was error, it was harmless error in this case. What Collier really needed to prove was that Finkelstein received the letters, or at least that the letter of September 9, 1988 was delivered to Finkelstein's last-known address. Since Collier could offer no proof of mailing or delivery (such as certified mail receipts), the result is the same: under the facts believed by the trial judge, Finkelstein was not notified of the impending prescription of his claim. Since we are bound by the trial court's credibility rulings absent manifest error, which we do not find in this case, we are bound by that finding.
We note, further, that except for the September 9, 1988 letter (which was sent only 10 days prior to prescription of the claim), none of the letters mentioned anything about the prescription date, nor is there any evidence that Collier ever advised Finkelstein that his right to file suit on his claim would expire one year from the date of the accident.
Although Collier's handling of the matter was not egregiously negligent, nevertheless we conclude that he was at fault. He should have made clear to the client throughout the course of his interviews and correspondence that suit had to be filed within one year of the accident. Further, when he received no response to his letters in March and May of 1988, he should have sent the final letter sooner than a mere 10 days before expiration of the prescriptive period, and he should have sent it by a method calculated to insure the client received it, or at least that it was delivered to the client's last-known address (e.g., certified mail, return receipt requested).
An attorney is not required to file suit at his own cost when he has agreed with the client that the proceeding will be in forma pauperis. The attorney is, however, required to make every reasonable effort to insure that the client is aware of impending prescription and that any written notification is delivered to the client's last-known address.
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed against the appellant, Wayne Collier.
AFFIRMED.